Antonio, Ana y Pilar Gómez de Agüero, demandantes y apelantes, *v.* Manuel Benigno y Virginia Gómez de Agüero y Aldea, demandados y apelados.

No. 5831.—*Sometido:* Febrero 16, 1933.  *Resuelto:* Marzo 16, 1934.

*H. Torres Solá,* abogado de los apelantes; *J. de Guzmán Benítez,* abogado de los apelados.

El Juez Asociado Señor Aldrey, emitió la opinión del tribunal.

Después de celebrada la vista de esta apelación se nos presentó moción para que la desestimemos por el motivo de que no tenemos jurisdicción para resolverla de acuerdo con el caso de *Collazo* v. *Dávila,* 45 D.P.R. 609.  En él se resolvió que en un procedimiento *ex parte* para elevar a documento público un testamento ológrafo no es apelable la resolución que en él recaiga, de acuerdo con el artículo 702 del Código Civil (643 de la edición de 1930), según el cual cualquiera

que sea la resolución de la corte de distrito, se llevará a efecto, no obstante oposición, quedando a salvo los derechos de los interesados para ejercitarlos en el juicio que corresponda; pero en el caso presente no se trata de un procedimiento *ex parte* como en el de Collazo, supra, sino de un juicio contencioso declarativo de si una carta contiene un testamento y de las personas a que él se refiere, por lo que siendo apelable esa resolución de acuerdo con el artículo 295, No. 1, del Código de Enjuiciamiento Civil, tenemos jurisdicción para resolver el presente recurso y no procede su desestimación.

Los demandantes en este pleito son tres hermanos de Joaquín Gómez de Agüero Cordero y han dirigido su acción contra los dos hijos de otro hermano de los demandantes, llamado Jesús, que falleció en 1918. El pleito tiene por objeto que se declare que una carta escrita por el hermano Joaquín, quien falleció en Barcelona, España, el 11 de noviembre de 1929 a los sesenta años de edad, contiene su testamento y que éste es a favor de los tres demandantes. Esa demanda fué declarada sin lugar con costas porque la corte inferior entendió que dicha carta no contiene el testamento de Joaquín y porque aunque lo contuviera no sería a favor solamente de los tres demandantes.

En la apelación interpuesta contra esa sentencia por los demandantes, éstos alegan como motivos de su recurso que son erróneos los dos fundamentos de la sentencia y que también lo es la condena de costas.

La carta que escribió Joaquín Gómez de Agüero Cordero y que se alega contener su testamento a favor de los tres hermanos demandantes es así:

"(Exhibit 'C')—Barcelona, octubre 10/29.—Querida Anita: Tu carta de fecha 17 de septiembre la he recibido hoy, la que dirijiste a la Rambla de Cataluña. En el alma siento no poderte dar buenas noticias mías, pues desde que llegué de San Sebastián he empeorado al extremo que he resuelto el operarme pues tengo un miedo horrendo el cojer aquí cama en una enfermedad grave como se me va haciendo ésta. Los dolores allá en San Sebastián me daban dos veces al día, pero aquí son continuos y hasta de noche. Mucho me

ha pesado el haber dejado mi País y mi casa que por mala que sea, es mejor que un País extraño. Ya te supondrás lo que estaré sufriendo moral y materialmente.

''Como te decía en una de mis anteriores en mi baúl en el bolsillo adentro de un chaleco está mi alfiler y Emma tiene una parte del comprobante de la carta de crédito la otra está en el baúl. Mi voluntad es que lo mío sea para ustedes, dándole una cantidad a una niña que en un campo llamado Arenas de Utuado, responde al nombre de Ana Ma. Matos.

''Mañana voy a hablar con el Cirujano. El médico me asegura que quedaré bien, pero para dar este paso ya te supondrás lo que estoy sufriendo.

''Pídanle a Dios por mí y sepan que mi pensamiento está en ustedes.

Los abraza,

''(Fdo.)  Joaquín.''

Los apelantes dicen que los términos de esa carta son análogos a los de la carta en el caso de *Vázquez* v. *Vázquez,* 34 D.P.R. 241, que declaramos contenía un testamento ológrafo.

El acto por el cual una persona dispone para después de su muerte de todos sus bienes, o de parte de ellos, se llama testamento. Así lo define el artículo 616 del Código Civil, edición de 1930. Como consecuencia de ese precepto, para que exista un testamento debe aparecer de él que la persona que lo hizo tuvo la voluntad o intención deliberada de disponer de sus bienes para después de su muerte, por ser el requisito esencial de todo testamento, según dijimos en el caso de *Pastor* v. *Miró,* 34 D.P.R. 52, y en el de *Vázquez,* supra. Esa es la piedra de toque para decidir si la carta en cuestión contiene el testamento de Joaquín Gómez de Agüero.

De la lectura de esa carta aparece que cuando Joaquín Gómez de Agüero la escribió estaba bastante enfermo, sufría mucho, al día siguiente iría donde el cirujano; que el médico le aseguraba que quedaría bien pero para él dar ese paso, de ir donde el cirujano, sufría mucho. Todas esas palabras y otras de la carta demuestran que la persona que la escribió

sabía que su vida estaba en peligro porque aparte de su enfermedad iba a sufrir una intervención quirúrgica, que como casi todas suele tener algún riesgo para la vida de una persona. Esa carta, escrita en ese estado de ánimo, dice también, después de referirse a donde estaba un alfiler de corbata suyo y una parte del comprobante de su carta de crédito, lo siguiente: "Mi voluntad es que lo mío sea para ustedes, dándole una cantidad a una niña que en un campo llamado Arenas de Utuado responde al nombre de Ana Ma. Matos." Estas palabras claramente, a nuestro entender, contienen el testamento de Joaquín Gómez de Agüero porque no sólo declara su voluntad "de que lo mío sea para ustedes," sino que también dispone que se entregue una cantidad a una niña determinada, sin que el hecho de que no especifique la cantidad que debe entregársele quite valor al testamento. Lo esencial es que él dispusiera de sus bienes y esa disposición voluntaria está claramente expresada en esa carta. Si a lo expuesto se agregan las circunstancias del momento en que esa carta fué escrita, se llegará fácilmente a la conclusión de que ella contiene el testamento de Joaquín Gómez de Agüero, pues dispone de sus bienes ante el temor de su muerte.

Este caso es análogo al que resolvió el Tribunal Supremo de España y que se cita en *Pastor* v. *Miró,* supra, en el que se decía en la carta que fué declarada testamento: "En esta primera carta de novios va mi testamento, todo para tí para que me quieras siempre y no dudes del cariño de tu Matilde." El caso de Vázquez a que antes nos hemos referido y en el que también se declaró por nosotros testamento el contenido de una carta, es similar al presente, pues en él al escribir una persona a su hermana le dijo que tenía una póliza de seguro y que se lo informaba puesto que ella era la única de sus hermanas solteras y era su única heredera.

Como en la carta que Joaquín escribió a su hermana Anita dice que su voluntad es que todo sea "para ustedes," los demandantes presentaron evidencia con el fin de probar que la carta se refiere a los tres demandantes. De esa prueba

aparece que los tres demandantes y sus otros dos hermanos Joaquín y Jesús eran muy unidos y vivieron en la casa de sus padres en Río Piedras antes y después de la muerte de éstos: que el hermano Jesús falleció en 1918 dejando dos hijos de su matrimonio con Belén Aldea: que ésta, en representación de sus hijos menores de edad, presentó demanda en 1924 contra los tres demandantes y el hermano Joaquín alegando que el testamento de Jesusa Cordero, madre de los demandantes y de Joaquín y abuela de los menores hijos de Jesús, era falso: que ese pleito produjo en los demandantes y en Joaquín un gran disgusto y la ruptura de relaciones con la familia del fallecido Jesús: que en los viajes que hizo Joaquín a España escribía todas las semanas a los tres demandantes dirigiendo las cartas a nombre de todos o de algunos de ellos, como aparece de cartas que presentaron.

De la prueba de los sobrinos demandados aparece, según la declaración de Belén Aldea, madre de los demandados, que efectivamente los hermanos Gómez de Agüero eran muy unidos y tenían igual carácter: que ella y su marido estuvieron separados trece años, viviendo entonces Jesús con sus hermanos y ella y los hijos en la casa de los hermanos de ella: que cuando su marido se enfermó estaba en la casa de sus hermanos, quienes lo recluyeron en el Manicomio, lo que ella supo después de estar allí, donde falleció: que cuando su suegra enfermó y murió en 1923 fué a la casa donde vivía la familia Gómez de Agüero, siendo ésa su última visita a esa familia: que con motivo del pleito que puso en nombre de sus hijos contra los tíos de ellos después de la muerte de la madre de los mismos, se enfriaron las relaciones entre su familia y la de aquéllos, pero que luego se reconciliaron y Joaquín era atento con sus sobrinos y en sus viajes escribía postales a ellos y les hacía pequeños regalos: y que cuando Joaquín se ausentó para España la última vez no fué a despedirse de sus sobrinos. La demandada Virginia admitió que las relaciones entre ambas familias se entibiaron con motivo del pleito, pero dijo que después se restablecieron y que ella

iba a la casa de los tíos y que Joaquín en sus viajes le escribía postales, las que leyó en el juicio y le enviaba retratos suyos, que mostró, y le hacía algunos pequeños regalos. Un testigo, novio de Virginia, declaró que algunas veces la acompañó a la casa de sus tíos. El otro demandado y otro testigo poco dijeron sobre ese particular.

Es frecuente que cuando surge una separación entre los consortes en un matrimonio y cada uno de ellos vuelve a vivir con sus respectivas familias, las relaciones de amistad y parentesco entre los separados y sus respectivas familias desaparezcan o por lo menos queden muy limitadas, por lo que puede razonablemente concluirse que después de la separación de Jesús Gómez de Agüero y de su esposa Belén Aldea las relaciones entre la familia del marido, donde él fué a vivir, y la de la esposa debieron quedar muy quebrantadas, como lo demuestra el hecho de que Belén fuera a la casa de los tíos de sus hijos al morir la abuela de éstos, sin que volviera después a esa casa. Si a esto agregamos que el pleito en que se imputaba a los hermanos del fallecido Jesús que el testamento de la madre de ellos era falso les produjo un gran disgusto, como lo produciría, naturalmente, a cualquier persona, puede concluirse sin dificultad que las relaciones entre esas dos familias quedaron terminadas como reconoce Belén Aldea; y si a esto se agrega el cariño fraternal que Joaquín y los tres hermanos se profesaban, que vivían juntos, y que Joaquín les escribía con mucha frecuencia a los tres o a algunos de ellos para los tres sin que en las cartas presentadas mencionase a sus sobrinos, se hace fácil concluir que cuando escribió a su hermana Anita diciéndole ''mi voluntad es que lo mío sea para ustedes,'' se refería solamente a ellos, a los tres hermanos que ahora son demandantes y no a sus sobrinos, por las circunstancias expresadas.

La dificultad que tiene la anterior conclusión es que la prueba que los demandados presentaron tendía a demostrar que si bien hubo el disgusto entre las familias producido por el pleito, luego se reconciliaron y que la demandada Virginia

visitaba la casa de sus tíos y recibió postales de Joaquín cuando viajaba y retratos de él y también una carta, que no fué presentada en el juicio por haber sido rota pero cuyo contenido permitió la corte inferior, quizá indebidamente, que se dijera oralmente como prueba supletoria, con la protesta de los demandantes; y que en esa prueba se fundó la corte inferior para declarar que si la carta contuviera un testamento la palabra "ustedes" no se refería a los demandantes solamente sino también a sus sobrinos. Nos parece que aún dando crédito a la prueba de los demandados, no es suficiente, teniendo en cuenta todas las circunstancias concurrentes en este caso y que hemos consignado, para destruir la conclusión de que cuando Joaquín escribió su carta-testamento a su hermana Anita diciendo "mi voluntad es que lo mío sea para ustedes," se refería únicamente a los tres hermanos con quienes vivió por sesenta años, con quienes estuvo siempre tan íntimamente unido y a quienes siempre dirigía sus cartas cuando se ausentaba de esta Isla. Aparte de esto, si él hubiera querido que sus bienes fuesen también para sus sobrinos, le hubiera sido fácil decir "para ustedes y mis sobrinos", como lo hizo cuando quiso que a la niña de Utuado se le entregara una cantidad.

*La sentencia apelada debe ser revocada y dictarse otra declarando con lugar la demanda en sus dos extremos, sin especial condena de costas.*